Madam Clerk, please call the next case. Cases 025 and 026, Trzeciak. If the council will approach the podium, please. And if you could please state your name. Jennifer Bontrager, State Appellate Defender for Joe Trzeciak. Peter Fisher, Assistant State's Attorney on behalf of the people. Okay, I don't know if you all were here when I made the opening statement, but each side, if you could give us an idea of how long it will take for your argument. And we don't watch the clock in this division, so you can have as much time as you want. We only ask that you don't repeat yourself. So how long? What type of time do you want? I stand on no more than the standard 15 minutes. Is there anything for rebuttal? Okay. Could you please keep your voice up? Yes, I'm so sorry. 15 minutes would be fine for us, too. Mr. Fisher, you represent the people. Okay. And young lady, spell your last name for me. My last name, B-O-N-T-R-A-G-E-R. It's on the briefs. Thank you. Okay. Tassa. Good morning. May it please the Court. Good morning. I'm Jennifer Bontrager for Joe Trzeciak. This case was supposed to be about whether Joe Trzeciak killed Don Kasovich. But the trial turned into a parade of horribles. With the jury hearing extensive evidence about Joe's domestic violence, resisting arrest for unrelated charges, essentially preventing the jury from viewing the evidence related to the murder, paltry as it was, in a dispassionate manner. As the errors in this case were numerous, there are seven substantive issues in the briefs. I am prepared to answer any of your questions, though I had planned to focus on the second, third, and fourth issues in the briefs. And unless your honors prefer otherwise, I had planned to start with marital privilege. In April 2004, when Laura Nilsen was still married to Joe Trzeciak, Joe allegedly told Laura that he would kill Don Kasovich, the victim in this case. That statement should have been excluded. Oh, I'm so sorry. Sorry. Counsel, for our help, if you can tell us the three issues of which you're going to talk. Certainly. Issue two in the brief was regarding the marital privilege. Issue three was the evidence of flight for unrelated offenses. Issue four was the other crimes evidence of the domestic violence. So with regard to the marital privilege issue, so as I said, in April 2004, when Laura Nilsen was married to Joe Trzeciak, Joe allegedly told Laura that he would kill Don Kasovich, the victim in this case. But that statement should have been excluded as subject to the statutory marital privilege. Illinois' marital privilege prohibits one's spouse from testifying to any communications, admissions, or conversations within the marriage subject to certain exceptions. None of those exceptions apply in this case. Joe was not charged with a crime against Laura. There were no children involved. The case was not about spousal abandonment. Joe was not charged with or being investigated for a sex offense of a minor within his or Laura's care, and Laura did not act as an agent for Joe. Nevertheless, the trial judge carved out a new exception to the privilege, finding that the evidence of ongoing domestic violence within the marriage against Laura rendered the marriage in shambles and required that the statement be admitted. But the judge's action carving out that new exception violated the separation of powers doctrine. In addition to the plain language of the statute, the judge was simply not at liberty to carve out a new exception, given that the language of the statute was clear and unambiguous, and the legislature did not provide for any mechanism for the judge to create a new exception. As part of that statement coming in, the jury also heard a great deal of evidence of domestic violence. This other crimes evidence came in, wholly unrelated to the murder of Don Kasevich, yet the jury heard extensive evidence. Were there objections? Yes. All of these issues are preserved. There were contemporaneous objections. There were several pretrial motions litigated on each of these issues, and they were all included in the post-trial motion. Okay. So instead of hearing evidence about whether Joe Treziak killed Don Kasevich, the jury heard a great deal of evidence that Joe Treziak beat his wife, that he tied her up, that he locked her in closets, that he locked her inside the house. None of that had anything to do with whether Joe killed Don Kasevich. The other crimes generally are inadmissible. Isn't it the state's theory that the murder occurred out of anger or because of a triangle? Yes. So you're suggesting that this domestic battery or spousal abuse has nothing to do with the issue at hand? Joe beating his wife is irrelevant to whether he committed this murder. That he may have had a jealous motive could be relevant to motive, but him beating his wife can be divorced from the jealousy. Laura could have testified that Joe accused her of having an affair with Don, but her additional testimony that he beat her on a daily basis, that he duct-taped her to a chair, that he locked her in a closet or locked her in the house, is irrelevant to whether the murder occurred and is deeply prejudicial. It makes Joe look like a bad person who deserves punishment, regardless of whether he actually committed this murder. And the jury heard other evidence that Joe was a bad guy who is in trouble with the law. They first heard that Joe fled when a Hammond police officer tried to approach him. The officer was approaching him on a domestic battery warrant. Joe fled. He fled into Chicago. But this was nevertheless admitted. And what's the chronology of that event, the fleeing as it relates to the homicide? The homicide was at the end of June. June 25th? Yes. And when did your client flee the Hammond police? The first time he flees the Hammond police comes a couple weeks later. I don't have the exact date off the top of my head. So you're suggesting that he was attempting to elude the Hammond police because of a warrant issued out of Hammond? Correct. Where is that evidence? The officer who's pursuing the Hammond police officer who's pursuing Joe testifies that he's looking for him for this domestic battery warrant. Who can speak to why Joe fled? Joe himself, certainly. And he didn't testify, but the inferences to be drawn from the evidence, evidence of flight can be admitted to show consciousness of guilt. But it is admissible only when the record shows no other reason why the defendant would flee. And here we have multiple other reasons the defendant would flee. Laura testifies, obviously, to the domestic abuse. The police officer testifies that he's looking for Joe for the domestic battery. The Bureau of Alcohol, Tobacco, Firearms, and Explosives agent testifies that they're looking into Joe for some firearms offenses, which is how the BATFE ends up in the second instance of resisting that the jury hears about, surrounding Joe's house along with the Hammond SWATs. Joe tells his wife that he's always afraid the police are going to come to his house because he keeps drugs there. He keeps guns there that he's not supposed to have. There's multiple pieces of evidence in the record illustrating that Joe was fleeing from police for the domestic battery and for these guns and drugs he had in his house and not for consciousness of guilt for the murder. Plus, especially notable, is the fact that at one point he fled in the first instance he fled into Chicago, which if he suspects that the Chicago police want him for a murder, it makes no sense to flee into the jurisdiction that wants you for the more serious crime. So this evidence of flight showing that, you know, that Joe is a bad guy fleeing from the police, having an armed standoff with a SWAT team and federal agents should never come in. This was far more prejudicial than it was probative of anything. As well as, you know, the domestic violence and what should not have come in in violation of the privilege. The jury heard a lot of evidence that Joe Tresiak is a bad guy. They did not hear a ton of evidence that he was involved in the murder of Don Kasovich. I realize I'm not out of time. If there are any other questions, I reserve the rest of my time for rebuttal. I'm sorry? The wife's testimony, you say she should be barred because it's violated. Could she testify then as to the gun, as to locking her up, beating her, tying her up, and the threats made to her to show his personality? Well, no. I mean, evidence of the domestic violence simply shows that he's a bad guy, which is not what he was on trial for. Her testimony regarding recognizing the gun, she could testify to without testifying that he used it to beat her. So my argument has not been that her testimony needed to be barred altogether, simply that it should have been much more limited than it was. Thank you. Thank you. Thank you, counsel. Good morning, and may it please the Court. Before I start with some of the arguments, I would just get the chronology correct here. The last person to see the victim alive saw him about 1 o'clock in the afternoon of June 29, 2004. The victim's body is found about 10 o'clock at night when she goes back to the trailer on June 29, 2004. The first Hammond police officer confrontation took place on July 22, 2004, and then the arrest and the second Hammond confrontation took place July 26, 2004. So it was three weeks to a month after the murder itself that the defendant first flees from the Hammond police officer and then is eventually arrested after barricading himself in his house. With regard to the first issue, the marital privilege issue, under no rational system of law can anyone say that beatings and death threats should be confidential marital communications. And that's what we have in this case. We have a defendant who is threatening to kill not only his wife at the time, who is by the time of trial, they've been divorced, they're still divorced, they were married at the time of trial. He's beating her. He sticks the gun in her mouth. He threatens her. He's a jealous man. He was jealous of just about anything she did. He locked her in the house at various times to keep her away from different people. One of the people he was jealous of was the victim, Donald Kosevich. He specifically threatens to kill her and the victim. In fact, at one point he takes her. After she receives a phone call, he goes into a rage, threatens to kill the victim and his wife, throws her in the back of a truck. She's bound. She's gagged. Takes her over to the victim's house, pounds on the door of the trailer, and then takes her back home. Even if she'd never said anything in this case about the actual statements made to her by the defendant, those actions would still have come in. Those actions are in no way privileged. His binding and gagging her and beating her and sticking a gun in her mouth, and that's relevant to the gun because she identifies the murder weapon. She says, this looks like the gun. The murder weapon was destroyed before trial in a perfectly legitimate manner by ATF and a separate prosecution, and that's not an issue here. But she identifies a picture of the gun and says this is the gun. It's important. She has familiarity with the gun. It's been stuck in her mouth. It's been stuck in her head. She's been threatened with it on numerous occasions. But going back to the actual time, and this is June 24th, this is about four or five days before the murder itself when he makes these threats, taking her over there in the car and beating on the victim's door, the jury still would have figured out that this was a jealousy situation. Excuse me, counsel. I think, and I don't intend to speak for Ms. Bontrager, but I think she's conceded that portions of her testimony may have been admissible. She's taking exception to what she would consider to be an inordinate amount of inadmissible testimony. So when you suggest the physical acts would have come in, but perhaps not her testimony concerning the conversation between she and her husband. Well, I'm suggesting that even if you take those statements out, the result of the trial would have been the same. I'm arguing that those statements should have been admitted. And the reason they should have been admitted is really threefold. And this relates to public policy. And it's important to remember that these are questions ultimately of public policy. And on the one hand, we've got a public policy with regard to marital privilege, which is intended to foster and promote harmony in the marriage. I would assert, as the trial judge did, that that's kind of a joke in a situation like this where you have a battered woman who, by the time of trial, is divorced. There's nothing to save in this marriage. There never was anything to save once she went on the 24th or slightly between the 24th and the 29th, having been beaten and filed a complaint and an arrest warrant was issued. So the purpose of the statute on marital privilege is to promote harmony. On the other hand, we also have a legislative purpose in our Domestic Violence Act, which is to prevent domestic violence in this state. And I would say that's an overriding purpose in this particular case. The other thing to note is that the statute itself provides an out or an exception for cases in which one or the other spouse is charged with domestic abuse of the other. Now, in this particular case, this defendant was charged with domestic abuse of his wife. The statute in what state are you making reference to? Illinois statute. And so she was charged in Illinois. She was not. He was charged in Illinois. He was not. I admit that there is a... So is it appropriate? Well... I read this stuff. Yeah, I know. I think it is appropriate, Judge, because what this legislature is getting at is the content and context of the statements. And as I said before, there's no rational system in which beatings and death threats should be considered intimate spousal communications. And once the statute's created an exception for those type of cases, it shouldn't matter whether we also, you know, he was charged in Indiana with that. There's nothing in the record to say what happened with that case. He was also charged at the same time with a federal case, and so he ended up with a lot of charges pending, and I don't know if they ever went to trial on the domestic violence case in Indiana. But he was charged with it. There was an arrest warrant for his arrest when he was eventually arrested, barricading himself in his house. He was not charged in Illinois. He probably could have been with waiver one or two statements, but the vast majority of the conduct took place in Indiana. The marriage was in Indiana. The other thing is there is an exception in the case law for statements that are not intended to be confidential. The usual situation for those is where a husband and wife are making, having a conversation, and that conversation is easily accessible to another. There's another person in the room. It takes place in public, something like this. I would also argue in this particular case that this was not intended to be confidential. He's making a threat to his wife, telling her to stay away from Donald Kisevich. The intent of that statement was to keep her away and to have her tell Donald Kisevich to stay away. He wanted that statement conveyed to Donald Kisevich. So it was never intended to be a confidential communication in any event. The thing to remember, and I happen to review People v. Sanders, which is cited in our brief, and they're talking about the marital privilege, and they talk about that the privilege at issue here results not from a policy of safeguarding the quality of evidence at trial but from a policy of promoting family harmony independent of what might occur in some trial at a future date. And then they cite the United States Court in Trammell v. U.S. stating that testimonial exclusionary rules and privileges contravene the fundamental principle that the public has the right to every man's evidence. As such, they must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth. There is no public good whatsoever promoted when you shield death threats and beatings and the statements made during those beatings. And I would assert that the judge properly ruled that the marital privilege did not apply in this exception, in this instance. And even if it did, as I said earlier, the jury still would have known that from properly admitted evidence that this defendant was a jealous man, this defendant was a violent jealous man who went to the very victim's house and pounded on the victim's door with his wife tied up in the back of the truck. What else could the jury have figured out? Obviously, that's what this is all about. They would have figured that part of it out anyway. So it's harmless errors, would you say? If it's error. I don't think it's error, but it would be harmless error anyway, yes. And you're saying basically, I understand what you're saying. You're saying, you see, the criminal acts defeat the privilege. In this instance, yes. He had a gun. That's a crime. Sorry, I didn't hear that, Judge. He had a gun. He had a gun. Well, the fact of his having a gun isn't privileged anyway. It's only the statements that might be privileged. Nor is it unlawful per se, is it? It's not unlawful per se, but to stick it in your wife's face and tell her you're going to kill her or just to stick it, you know, to beat her with that weapon, that's unlawful. It was an act and it's a crime. Yes, it is a crime, yes. What you did. Yes. Locking up was an act. Yes. And that's criminal. Yes. The beating, that's an act. And that's criminal as well, yes. Tying up, as duct tape was used to. That's unlawful restraint, yes. That would be a crime. These do take place in Indiana, and Indiana did have jurisdiction over them. That's why they weren't charged. Part of it could have taken place in Illinois. She was tied up when she came to Illinois, but, you know, he's charged with a murder in this case. What about the threats? Well, the threats are communications, but I'm arguing that they are not worthy of the marital privilege given the public policy behind the marital privilege. It serves no purpose here, and as I just quoted from the U.S. and Illinois Supreme Courts, there is a policy decision that we're going to strictly construe those in favor of the public policies that are intended to be followed here, and the public policy behind promoting marital harmony, the opposite would take place here if you were to shield these statements from admission. So are you suggesting that public policy should trump the statutory provision? Well, there is a statement. Do you have a copy of the Marital Privilege Act? I do. Can you point out? All right. It's 725 ILCS 5-115-16. In criminal cases, husband and wife may testify for or against each other. Neither, however, may testify as to any communication or admission made by either of them to the other or as to any conversation between them during the marriage, except in cases in which either is charged with an offense against the person or property of the other. Well, here the defendant was charged. I admit he was not charged in Illinois, but he was charged in Indiana. Does it apply? I'm arguing that it does apply, yes. All right. Yes. That is our assertion. And that, taken in conjunction with the public policy that's expressed in another statute, which is the Domestic Violence Statute, Domestic Violence Act of 1986, which I extensively quoted, 750 ILCS 60-102, expresses a policy to eliminate domestic violence and to do everything and expressed a policy that basically indicated that the law had failed to keep up with modern notions of what should take place in a marriage and that a lot of things that had been swept under the rug traditionally in our society could no longer be tolerated. And I'm indicating that I think the marital privilege, insofar as it would protect conversations like this, is one of those things that the legislature has now expressed in another statute a disdain for. And I'd say if you read those two in conjunction with each other, the public policy of Illinois is not to say that beatings and death threats are privileged spousal communications in any of them. You've pointed out a number of acts that may be criminal in and of themselves. Were any of those brought before a court in Illinois? No, they were not. He was not charged with any of those acts in Illinois. There was an arrest warrant issued for him. He was arrested on those charges on a complaint for domestic battery in Indiana. And the record does not indicate what happened on that Indiana case. Concerning the domestic violence, there were a number of photographs introduced during the course of these proceedings. Yes. What bearing does that have on, those photographs have, on who killed the victim? Well, it bears on the motive in this case. It bears on the credibility of the woman who testified, Laura, his ex-wife. And it also goes to show that he was being sought for a domestic violence case as well. Now he was, this dovetails into the next argument, which is the evidence of flight. This defendant fled from the Hammond marked squad car and a police officer in uniform who appeared in his neighborhood. And he took off on a high street chase and eventually lost the police officer. Now he went through Indiana, he went through Illinois. This case takes place in that section of Chicago, which is on the far southeast side of Chicago, where the streets, it's heguish, it goes in and out of Indiana. Some things in this case take place in Indiana, some of them take place in Illinois. So they're going in and out. So there's no shock that this defendant would lead the Hammond police officer through the two states. When he did so, our argument is that he had reason to know that the police were looking for him for the murder in this case. And therefore, his flight is relevant. Flight is generally relevant if the defendant knows that he's being sought by the police. And you can show those circumstances. And in this case, we put in two big pieces of evidence. The first was the first July 22 incident where the officer chases him. The second is the incident, and that turns not only from flight but also to the circumstances of arrest, which again, the circumstances of arrest in this case show there's an inference that he had a guilty conscience. You have to remember that the crime in this case was committed sometime between 1 o'clock and 10 o'clock on June 29, 2004. In that period, the defendant is seen with a bleeding arm by two different people. He goes to a person's house, takes a bath, has somebody wash his clothes, has given himself a haircut, things that he'd never done in his life with these people before. Very unusual. And of course, we know that the defendant did leave his blood at the scene. His blood is found on a piece of broken glass at the back of the trailer. So the defendant, that glass was not broken before 1 o'clock in the afternoon on that date. The defendant also says to a woman friend of his and then to his own daughter, he asks, have you heard anything about a murder in Hegwisch in a trailer? Well, we put on evidence to show that there had not been another murder in Hegwisch at all for more than 12 months before this crime. So the afternoon of the crime, he's already asking about something that the police don't even know about yet. He's already assuming that somebody's going to come and look for him. He gets an overnight bag. He does this thing where he goes down the alley of his house and jumps over the fence and gets this bag together and then goes to this Mr. Barness's house and delivers a bag. And of course, we know later that the bag was left there. And we also know that in Mr. Barness's house, the murder weapon itself was found, along with a pill bottle from the victim's house with the victim's name. The defendant gives his friends two completely different stories about how he has this cut on his arm. And the friends give different descriptions of how much one of the women says it's very bloody, the other guy says it's not as bloody, but he'd already taken a rap off by that point. To the one person, he says he was drunk and fell down some stairs. To the other person, he says, I was in a high-speed chase with the police and I crashed my car and broke it on some glass, which we also know wasn't true because there was nothing wrong with his car when he was later arrested. So the fact that he gets an overnight bag, the fact that all these things show that he knows the police are going to come after him, he knows the police are looking for him. And the fact that he also may know the police are looking for him for domestic violence, although there's no evidence that he knew that his wife had already filled out a warrant, he knew that she was no longer at home. Remember, she moved out of the house. And when she moved out of the house, he also mentioned to another woman, well, you know, we were split up and made some comments that indicated jealousy of her as well. But by the time the Hammond police officer confronts him in July, the defendant has reason to know certainly that the police are looking for him on the murder case. He has reason to believe that the police also might be looking for him for his drug and gun activities. And remember, the defense wanted that in in this case. They wanted that information in so they could make this argument that he's really not fleeing from the police for the murder. He's fleeing from the police because of the drug and the gun case or because of the domestic violence case, but not because of the murder. An argument is, well, that, and we cite that one case where the police go to Utah and the defendants are wanted for escape and then they're in a stolen car and there's this chase and the question is, you know, why were they eluding the police there? And the court said basically, well, just because you commit one crime, then you commit multiple crimes doesn't mean that you can't have an inference on all of them. The inference is still valid. Now, the fact is that you can infer that he was running for several different reasons, but that doesn't invalidate that he was fleeing for this particular reason as well. And so that's certainly relevant evidence. The final issue that counsel argued today was that the other crimes evidence, the domestic violence evidence, and again, as we've pointed out, the motive for this case was jealousy, jealousy of the wife and this man. Would you say there was quite a bit of testimony regarding? Well, interestingly enough, as you will recall, before trial there was a lengthy, there were several lengthy hearings on exactly this issue. And the judge made findings, although the defense hasn't included them in the record, made findings, detailed findings about all these pieces of evidence. And I would say only about a quarter of the evidence that the state sought to introduce was actually introduced. There was a whole bunch of more bad stuff about those. My question is whether that, which was it, did it constitute a significant portion of the trial? It cannot constitute a significant portion in that it was going to the motive issue. And yes, I don't think it was an improperly significant portion of the trial, but there was a couple, you know, she testified at length to it. And I don't think it was in an appropriate amount of evidence on that issue. And again, the standard is, you know, whether the judge abused her discretion. And when you've got clear evidence that she was exercising her discretion before trial and keeping most of this evidence out, that bolsters the fact that she did not abuse her discretion in allowing this. She waited. She let some in and she kept most out. And that is, by definition, an exercise of discretion. And in this particular case, it went directly to the motive to show a jealous, angry man who killed the victim because he thought that he was fooling around with his wife at the time. Certain professions have privileges. Yes. The psychiatrist, if I were to go in to the psychiatrist and said, when I leave here, I'm going to go sheep, joke. The psychiatrist is no longer bound. Am I right? That's true. He must. He's obligated to take some action. Yes. Do you feel the same as here with the spousal privilege? Well, the analogy is a little different because here she didn't go and tell, she didn't warn the guy. She didn't tell the police. If she had, I think it certainly would have been legitimate. But you're right. There are public policy exceptions to the traditional rules of patient-client privilege, pastor-client privilege, those kind of traditional privileges when we're trying to protect the public. She didn't take any action here. Well, they lived together. Well, she did take action in terms of going to the police. She went to the police. They lived together for some period of time before being married. They did. And it's my recollection that these things that she complained of, the defendant carried on prior to marriage. Right. And the judge wouldn't let that in. Right. And then for some six months thereabout, I think they were married in January and the crime occurred in late June. Throughout the marriage, these acts occurred as well, what you would term as spousal abuse. Right. And some of them the judge let in, but most of them she didn't. Right. She married this gentleman knowing full well of his character and propensity. Well, you know, there is a psychology of domestic violence victims that, you know, we all ask why would she stay or why would she do this. There's a lot written, and the law recognizes the difficulty in getting out of these relationships, and some women's self-esteem is so low that they attach themselves to one after another of these abusive individuals. Many times these women were abused as children, things like that. So it's not uncommon that she wouldn't leave. I mean, she did leave eventually. She did, you know, we have evidence in the record where she eventually goes to the hospital, and that's when she files the domestic violence complaints, and then she never goes back. And the defendant is looking for her, and that's also relevant. Is marital harmony a relative term? I suppose it is, but I think there are some absolutes when you're committing felonies and death threats and things like that. I mean, you know, there are all sorts of levels of marriages, but this is so far to the one level of relativeness that I think it goes beyond the bounds of what the law should accept. For those reasons, Your Honors, and for the reasons we expressed in the brief, we'd ask that you affirm the defendant's convictions and sentence. Thank you. Thank you, sir. I just have three brief points and, of course, any questions. First, regarding marital harmony, there are numerous other cases that involve troubled marriages  in particular cited in the briefs is Muzard. That involved a marriage with a cheating spouse, plans to divorce, and nevertheless communications from the husband threatening the wife and the wife's lover were subject to exclusion because of the marital privilege. Two, the legislature has amended the marital privilege statute as recently as last year. They also amended it in 2010. They have not provided for the kind of exception the state seeks here. Finally, regarding whether the statement was intended to be confidential, statements are presumed confidential. Here there is no evidence suggesting otherwise. It's inappropriately speculative to suggest so and, frankly, absurd, given that nothing made Joe Trusiak angrier than Laura talking to other people. If there are any questions, I'm happy to answer them. Otherwise, I think my reply brief adequately responds to the state's arguments. Thank you. Thank you.